Carroll KISSER

v.

Henry G. CISNEROS, Secretary of U.S.
Department of Housing and Urban
Development, et al., Appellants.

No. 92–5206.

United States Court of Appeals,
District of Columbia Circuit.

Argued Oct. 25, 1993.

Decided Jan. 25, 1994.

Jeffrey T. Sprung, Asst. U.S. Atty., with whom J. Ramsey Johnson, U.S. Atty., John D. Bates and R. Craig Lawrence, Asst. U.S. Attys., and John P. Kennedy, Associate Gen. Counsel, U.S. Dept. of Housing and Urban Development, Washington, DC, were on the brief, for appellants.

Steven D. Gordon, with whom Michael H. Ditton, Washington, DC, was on the brief, for appellee.

Before: SILBERMAN and RANDOLPH, Circuit Judges, COFFIN,* Senior Circuit Judge, United States Court of Appeals for the First Circuit.

Opinion for the Court filed by Senior Circuit Judge COFFIN.

COFFIN, Senior Circuit Judge:

This case concerns a decision of the Department of Housing and Urban Development (HUD) to debar Carroll Kisser, a former employee of DRG Funding Corporation (DRG), from participating in primary and lower tier covered transactions "throughout the executive branch of the Federal Government," *see* 24 C.F.R. §§ 24.200, 24.110(a), for three years ending March 22, 1992. The district court reversed the decision of the

Secretary's designee sustaining HUD's debarment decision. We reverse.

### I. *Factual Background*

In January 1988, Carroll Kisser began working as DRG's executive vice president for administration. DRG then held the largest portfolio of multi-family properties coinsured by HUD and financed through the Government National Mortgage Assistance (GNMA), a part of HUD. DRG both made mortgage loans, coinsured by the Federal Housing Administration (FHA), and issued securities under GNMA's mortgage-backed securities (MBS) program.

Under the GNMA MBS program, DRG issued securities backed by "pools" of mortgages. Each month, DRG collected mortgage payments from property owners, and, in turn, "passed through" to security holders principal and interest payments on the mortgage in the pool in which they had invested, less servicing fees. If a property owner failed to make its monthly payment, DRG, as a HUD coinsured lender, was responsible for meeting the monthly payments to security holders using its own funds.

In June 1988, a GNMA program specialist became concerned that DRG had conducted foreclosure sales but had failed to pass through to security holders proceeds from these sales in the month following their receipt. In GNMA's view, this pass-through was required by the guaranty agreement entered into by DRG and GNMA, and by the MBS guide. Accordingly, GNMA requested the Federal National Mortgage Association (FNMA) to conduct a procedural review of DRG's administration of its MBS pools.

FNMA's review confirmed that DRG did not immediately pass through foreclosure sale proceeds to security holders, but instead used these funds to repay previously unrecovered advances. FNMA informed DRG that GNMA required a pass-through in the month following receipt. DRG contested this requirement, pointing to a cash flow model that had been provided to DRG's president by FHA in October 1987, which supported the company's position that the funds were

* Sitting by designation pursuant to 28 U.S.C. § 294(d).

not required to be passed through until after final disposition of their coinsurance claim by FHA. DRG officials indicated that they would not change their practice without written instruction from GNMA.[1]

On July 1, 1988, GNMA defaulted DRG as an MBS issuer, based on DRG's alleged program violations. Four days later, Kisser joined other DRG officials in a meeting with representatives from GNMA and FHA to discuss the circumstances surrounding the default. At that meeting, GNMA stated that DRG was required to pass through all foreclosure sale proceeds to security holders on the fifteenth day of the month following receipt. DRG agreed to comply with this directive by July 15, and passed through foreclosure sale proceeds received from sales from March through June 1988. Based on these actions, GNMA withdrew its default of DRG.

On September 12, Donald DeFranceaux, DRG's president, wrote to HUD's under secretary, Carl Covitz, contending that DRG's pre-July 15 pass-through practices had been legally correct, and requesting that Covitz overrule GNMA's directive to DRG. Three days later, HUD's general counsel, J. Michael Dorsey, responded. He affirmed GNMA's position that pass-through was required of the principal portion of the foreclosure sale proceeds on the fifteenth of the month following their receipt. Dorsey further concluded that the net proceeds for the sale of each foreclosed property must be deposited in a principal and interest account, which accounts must be kept separately for each sale, and could not be commingled. In addition, Dorsey stated that the interest portion of the foreclosure sale proceeds could not be used to pay required payments on other pools, or to reimburse DRG for previous advances.

On or about September 15, GNMA demanded that DRG pass through the principal portion of the foreclosure sale proceeds from August sales. When DRG failed to do so, GNMA served the company with a second default letter.

In a letter dated September 29, 1988, an attorney for DRG informed Dorsey that DRG had received $8.5 million from September foreclosure sale proceeds, and that, from these proceeds, it had repaid itself $1.8 million for principal and interest that it had advanced previously to security holders from its corporate account. Kisser testified that DRG used the bulk of the September foreclosure sale proceeds to fund pass-throughs in other mortgage pools, rather than to compensate the corresponding pool's security holders. Price Waterhouse, an accounting firm retained by GNMA to audit GNMA's MBS pools after the September default, confirmed that it could not find the proceeds from DRG's August or September foreclosure sales in the appropriate accounts.

In March 1989, HUD suspended DRG, as well as Carroll Kisser and 15 other individuals connected with DRG, from all HUD programs and virtually all other transactions with the federal government, based on a pending criminal investigation of DRG, and its alleged violation of mortgage-backed securities program requirements. *See* 24 C.F.R. §§ 24.400–24.420. On April 24, 1989, Kisser resigned his position with DRG, as did most, if not all, of the company's other officers. HUD later lifted the suspensions of most of the DRG officers who had resigned, but did not lift Kisser's suspension. Kisser's suspension subsequently was overturned by an Administrative Law Judge (ALJ), but reinstated on review by the HUD Secretary's designee.

On September 21, 1990, still lacking a disposition of the criminal investigation, HUD began a new proceeding against Kisser. In this action, HUD sought Kisser's indefinite debarment, based on DRG's misconduct while it was still a certified coinsurer, which could be imputed to him because he was an officer of DRG at the relevant time. *See* 24 C.F.R. §§ 24.105(p) (defining "principal" to include "[o]fficer, director, owner, partner, key employee, or other person within a participant with primary management or supervisory responsibilities"); 24.325(b)(2) (allow-

---

1. The district court characterized the dispute as focused on the proper interpretation of foreclosure sale proceeds under section 2.05 of the guaranty agreement entered into by DRG and GNMA.

ing liability for HUD program participant's misconduct to be imputed to officers who "participated in, knew of, or had reason to know" of the participant's misconduct).[2]

In August 1991, following a nine-day evidentiary hearing, an Administrative Judge held that Kisser should not be disbarred, finding that Kisser was a responsible program participant; that he did not commit any of the alleged actions cited as grounds for his disbarment, nor was he indirectly or directly responsible for them; and that no debarment was warranted by the record.[3] She also found that it was "questionable" whether DRG violated any mortgage-backed securities requirement at all; and that, in any event, Kisser did not control DRG's "pass-through" payments to security holders.

HUD appealed this decision to the Secretary's designee and informed Kisser that his suspension would remain in effect pending the appeal. The Secretary's designee reversed the Administrative Judge's decision, but limited the debarment to a period of three years, with credit for time spent.

Kisser challenged both the suspension and the debarment actions before the district court, claiming that the agency's determinations violated the Administrative Procedure Act, 5 U.S.C. § 706(2) (1993) (APA), and the Due Process Clause of the Constitution. On cross motions for summary judgment, the district court vacated the suspension and the debarment. The court ruled that HUD's suspension of Kisser was arbitrary and capricious because the Secretary's designee, on reviewing the ALJ, had ignored the record before her; asserted her conclusions without evidentiary support; and also violated the relevant regulations, by putting the burden

of proof on Kisser to show that he should not be suspended. *Kisser v. Kemp,* 786 F.Supp. 38, 40–42 (D.D.C.1992).

As for the debarment, the judge focused on the "troubling question" of why HUD had debarred only Kisser, but not other similarly situated DRG officers. The district court vacated the debarment, finding that HUD's failure to explain why it had chosen to single out Kisser constituted arbitrary and capricious action. *Id.* at 42–43.

On appeal, HUD challenges only the district court's ruling reversing Kisser's debarment on the ground that HUD failed to provide a reasoned explanation for proceeding against Kisser, while not seeking to debar other corporate officers, whom, like Kisser, HUD previously had suspended. HUD does not challenge the district court's ruling vacating Kisser's initial suspension.[4]

## II. *Discussion*

■ We owe no particular deference to the district court's review of HUD's actions, where, as here, "the District Court and this court are both reviewing an administrative record, and no additional testimony was taken in the District Court." *Costello v. Agency for Int'l Dev.,* 843 F.2d 540, 543 n. 5 (D.C.Cir. 1988) (quoting *Walter O. Boswell Memorial Hospital v. Heckler,* 749 F.2d 788, 790 n. 2 (D.C.Cir.1984)).

■ Our review of HUD's debarment decision is therefore governed by the traditional "arbitrary and capricious" standard set forth in the APA, 5 U.S.C. at § 706(2)(A). This review is highly deferential; we must presume the validity of agency action.

---

2. It is important to note that suspension and debarment actions involve separate and independent enforcement proceedings, and are not, as Kisser suggests, two parts of one overall enforcement action. *See* 24 C.F.R. §§ 24.300–24.325 (regulations governing debarment); 24.400–24.-420 (regulations governing suspension).

3. The Administrative Judge who reviewed Kisser's debarment was not the same official who reviewed his suspension.

4. Although Kisser's debarment has expired, issues relating to it are not moot because it is likely that this sanction will continue adversely to af-

fect Kisser in future transactions with HUD, as well as with other federal agencies. *See County of Los Angeles v. Davis,* 440 U.S. 625, 631, 99 S.Ct. 1379, 1383, 59 L.Ed.2d 642 (1979); *Reeve Aleutian Airways, Inc. v. U.S.,* 889 F.2d 1139, 1142–43 (D.C.Cir.1989); *see also* 24 C.F.R. §§ 200.219 (requiring applicants for participation in HUD program to fully explain past debarments for HUD's "review, evaluation, and determination" for certification for future participation); 200.230 (allowing "significant violations of or noncompliance with [HUD] regulations, or programs or contract requirements" as a basis for disapproval from participation).

*American Horse Protection Ass'n, Inc. v. Yeutter,* 917 F.2d 594, 596 (D.C.Cir.1990). The court must determine whether the agency has articulated a "rational connection between the facts found and the choice made." *Bowman Transportation v. Arkansas–Best Freight System,* 419 U.S. 281, 285, 95 S.Ct. 438, 442, 42 L.Ed.2d 447 (1974) (quoting *Burlington Truck Lines, Inc. v. United States,* 371 U.S. 156, 168, 83 S.Ct. 239, 246, 9 L.Ed.2d 207 (1962)). We may reverse only if the agency's decision is not supported by substantial evidence, or the agency has made a clear error in judgment. *Citizens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 415–416, 91 S.Ct. 814, 823–824, 28 L.Ed.2d 136 (1971).

### A. The District Court's Decision

■ The district court held that HUD's failure to provide a reasoned explanation for its decision to proceed against Kisser, but not against several other DRG officers who were all "facially susceptible to debarment," was unreasonable, arbitrary, and capricious action on HUD's part. 786 F.Supp. at 42. In making this determination, the court relied on *Caiola v. Carroll,* 851 F.2d 395 (D.C.Cir. 1988), in which, it claimed, this circuit had established a rule requiring a "reasoned explanation" for a decision to debar some, but not other, members of a suspended corporation, all of whom were facially susceptible to debarment. 786 F.Supp. at 42. The court felt that under *Caiola,* HUD's failure to offer an explanation for its decision to debar only Kisser rendered the agency's decision illegitimate. *Id.*

The district court was mistaken in its determination that *Caiola* governed the outcome of this case. In *Caiola,* the Defense Logistics Agency initiated debarment proceedings against five officers of a corporation

that had pleaded guilty to criminal charges for filing false laboratory test results. Three of the officers challenged the proposed debarment on the ground that they had no knowledge of the corporation's illegal practices. The agency debarred two of the officials, finding that, in their capacity as officers and directors of the corporation, they had "reason to know" of its criminal misconduct, notwithstanding their lack of actual knowledge of these actions. The agency terminated the debarment of the third, without offering any explanation as to why, unlike the others, this officer did not have "reason to know" of the company's misconduct. The district court upheld the agency's decision.

On appeal, we reversed the debarment of the two officials, finding that there was no basis in the administrative record for the simultaneous finding that two of the officers had "reason to know" of the misconduct, while the third officer did not. 851 F.2d at 400. The panel's decision in *Caiola* did not, as the district court would have it, establish a "reasoned explanation" requirement to justify agency decisions to debar some, but not all, members of a corporation who are all facially susceptible to debarment. Rather, *Caiola* involved a situation where the agency had taken affirmative action to debar several corporate officers, and subsequently made inconsistent final decisions regarding their culpability. The *Caiola* court conducted the usual APA review of the whole administrative record to see whether there was any basis for the agency's action. The court found that the agency had applied its regulations improperly, because it found nothing in the record that would warrant distinguishing among the officers for purposes of sanction, and concluded that this differential result was an abuse of discretion. *Id.* at 398–400.[5]

---

**5.** Nor do other cases cited by Kisser support his claim that an agency must demonstrate consistency in exercising its discretion whether or not to take enforcement action. These cases all involved circumstances like *Caiola,* where in actions it took, an agency inconsistently applied its decisional criteria. *See, e.g., Airmark Corp. v. FAA,* 758 F.2d 685, 692–95 (D.C.Cir.1985) (FAA's inconsistent application of decisional criteria in grant or denial of exemptions under certain FAA regulations); *United States v. Diapulse Corp.,* 748

F.2d 56, 61–62 (2d Cir.1984) (FDA's inconsistent treatment of producers of two similar medical devices); *Local 777, Democratic Union Organizing Comm. v. NLRB,* 603 F.2d 862, 869–72 (D.C.Cir.1978) (NLRB's inconsistent determination of "employee" versus "independent contractor" status); *United States v. Undetermined Quantities of an Article of Drug Labeled as "Exachol",* 716 F.Supp. 787, 793–95 (S.D.N.Y.1989) (FDA's uneven and inconsistent application of regulatory policy with regard to "special dietary foods").

This case differs from *Caiola* on its facts because only Kisser was the subject of HUD's debarment action. In *Caiola*, all of the corporate officers at issue had been subject to an enforcement proceeding. Three opposed their proposed debarments, and when only two of them were debarred, those two challenged the inconsistent agency action. Here, by contrast, HUD chose to pursue debarment against only some of DRG's senior officers. While *Caiola* reflects this court's role in reviewing agency enforcement actions that have been initiated and completed, it does not permit us to compare final agency action with agency decisions not to institute enforcement proceedings.

Our authority to compare the completed case against Kisser with HUD's decision not to pursue enforcement against the other DRG employees who had been suspended is precluded by *Heckler v. Chaney*, 470 U.S. 821, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985), which held that the APA does not usually provide a right to judicial review of an agency's decision not to take enforcement action. In *Chaney*, the Court ruled that an agency's decision not to undertake enforcement action "is a decision generally committed to an agency's absolute discretion," and is therefore presumptively unreviewable. 470 U.S. at 831, 105 S.Ct. at 1655. The Court in *Chaney* gave several reasons for the general unsuitability of agency nonenforcement decisions to judicial review. First, agency decisions not to pursue enforcement action involve a "complicated balancing of factors which are peculiarly within its expertise," such as the proper allocation of resources to achieve agency priorities. *Id.* Second, agency decisions not to act generally do not involve the exercise of an agency's *coercive* power over individual liberty and property rights, and therefore "do not infringe on areas that courts are often called on to protect." *Id.* at 832, 105 S.Ct. at 1656. Third, when an agency decides not to take enforcement action, there is no focus for judicial review. *Id.* Finally, the Court found, an agency's decision whether to exercise its enforcement powers was akin to prosecutorial discretion, and should be accorded similar deference. *Id.*

The Court went on to note that the presumption of unreviewability may be rebutted where Congress has provided meaningful standards for the agency to follow in exercising its enforcement powers. 470 U.S. at 833, 105 S.Ct. at 1656. The court also noted that the presumption may not apply where an agency had refused to institute proceedings based on the mistaken belief that it lacked jurisdiction, or where the agency had " 'consciously and expressly adopted a general policy' that [was] so extreme as to amount to an abdication of its statutory responsibilities." *Id.* at 833 n. 4, 105 S.Ct. at 1656 n. 4; *see, e.g., Northern Indiana Public Serv. Co. v. FERC*, 782 F.2d 730, 745–46 (7th Cir.1986) (FERC's refusal to investigate alleged abusive actions by customers amounted to abandonment of regulatory function of ensuring just, reasonable, and preferential rates, and was therefore reviewable).

The *Chaney* Court also suggested that judicial review may be had of agency nonenforcement decisions where a "colorable claim is made ... that the agency's refusal to institute proceedings violated [a plaintiff's] constitutional rights." *Chaney*, 470 U.S. at 838, 105 S.Ct. at 1659; *see e.g., Smith v. Meese*, 821 F.2d 1484, 1489–93 (11th Cir. 1987) (permitting judicial review of alleged racial discrimination by Department of Justice in selecting targets for investigation of electoral misconduct).

Under the rationale of *Chaney*, HUD's decision not to initiate debarment proceedings against certain DRG employees is unreviewable. First, no statute expressly provides for debarment actions or contains guidelines that inform HUD's decision to bring such actions. Rather, HUD's debarment proceedings are governed by its regulations, 24 C.F.R. §§ 24.300–24.325, which are authorized primarily by a presidential order, Exec. Order No. 12,549, 51 Fed.Reg. 6370 (1986); *see* 53 Fed.Reg. 19160, 19180–19187. As part of the government's efforts to curb fraud, waste, and abuse in federal programs, Executive Order 12,549 mandates the establishment of a government-wide system for debarment and suspension in nonprocurement programs. *Id.* This Order requires that, to the extent permitted by law, execu-

tive departments and agencies follow government-wide due process procedures in debarment and suspension actions, as well as accord system-wide effect to debarments, suspensions, and other exclusions from participation granted by the different departments and agencies. *Id.* This Order does not, however, provide any standards to guide an agency's exercise of its discretion not to pursue enforcement action in a given case.

Nor do HUD's own regulations provide sufficient standards circumscribing HUD's enforcement discretion over debarment actions to rebut the presumption of unreviewability. While the regulations do set forth the causes for which debarment may be imposed, *see* 24 C.F.R. § 24.305, and establish detailed guidelines to follow once the decision to take enforcement action is made, *see* 24 C.F.R. §§ 24.312–24.325, they do not elaborate any specific standards to guide HUD's pre-enforcement deliberations. Rather, these regulations allow HUD broad discretion in determining whether to bring an enforcement action. The regulations grant the agency great flexibility regarding whether to pursue an action, even where cause for debarment is found, requiring simply that "[i]nformation concerning the existence of a cause for debarment ... be promptly reported, investigated, and referred, when appropriate, to the debarring official for consideration" and that official may, after consideration, issue a notice of proposed debarment. 24 C.F.R. § 24.311; *see also* 24 C.F.R. § 24.300. They also require HUD to process debarment actions "as informally as practicable, consistent with the principles of fundamental fairness." 24 C.F.R. § 24.310. In sum, by requiring HUD to justify its pre-initiation actions, the district court imposed on HUD requirements from which, under *Chaney,* it is exempt.

The reasons cited by the *Chaney* Court to support the general presumption of unreviewability of agency nonenforcement decisions offer further support for this conclusion. First, the district court's requirement that HUD provide a reasoned explanation for its decision to pursue debarment action against some, but not other, DRG employees would involve reviewing courts in decisions about HUD's resource allocation and enforce-

ment policy. But HUD is best situated to evaluate the costs and benefits of pursuing a debarment action in a given case. As the *Chaney* Court found, this is the very type of decision that is within an agency's particular expertise. *Chaney,* 470 U.S. at 831, 105 S.Ct. at 1655; *accord New York State Dep't of Law v. FCC,* 984 F.2d 1209, 1216 (D.C.Cir. 1993); *Roosevelt v. E.I. Du Pont de Nemours & Co.,* 958 F.2d 416, 423 (D.C.Cir.1992).

Nor is there any procedural step at the initiation of the debarment process which would provide a focus for judicial review of HUD's nonenforcement decisions. If HUD chooses to take debarment action, its regulations require that it give notice that such action is being considered, and detail the reasons for this action, the specific causes relied on, the applicable regulations and procedures governing the decisionmaking process, and the potential effect of a debarment. 24 C.F.R. § 24.312. No such notice is required when HUD chooses not to take action, and, given HUD's mandate to process debarment actions as "informally as practicable, consistent with fundamental fairness," 24 C.F.R. § 24.310, there is therefore virtually no decisionmaking process for the court to review in nonenforcement cases.

Kisser also fails to offer any compelling reason to interfere with HUD's enforcement discretion in this case by requiring a "reasoned explanation" for HUD's decision to take debarment action against Kisser, but not other similarly situated DRG officers. It may be that, like a prosecutor in a criminal case, HUD chose to begin by taking action against those DRG officers against whom the agency had the strongest case. Certainly the fact that HUD began by taking debarment action against Kisser and DRG's president did not preclude the agency from later taking action against other DRG officers. Finally, as a general matter, in deciding not to take enforcement action against several DRG officers, HUD is not exercising its coercive power over them.

## B. *HUD's Decision to Debar Carroll Kisser*

■ Our review is therefore limited to consideration of whether HUD abused its discretion in taking action to debar Kisser.

HUD sought to debar Kisser based on misconduct which occurred in DRG's business dealings with HUD while he was the company's executive vice president. In particular, HUD alleged that DRG had failed to pass through foreclosure sale proceeds to securities holders in the month following receipt, in violation of guaranty agreements, GNMA regulations, and the GNMA Guide; and that DRG had submitted false monthly remittance notices to security holders.

Under HUD regulations, an officer may be held liable for the "fraudulent, criminal, or other seriously improper conduct of a participant" if he or she "participated in, knew of, or had reason to know" of the participant's misconduct. 24 C.F.R. § 24.325(b)(2).[6] In this case, HUD pursued Kisser's debarment because he was the DRG officer responsible for supervising DRG employees in adhering to GNMA requirements, and therefore, according to HUD, he either knew or should have known that DRG was involved in this misconduct.

Kisser suggests that because he did not make the final decisions regarding DRG's pass-through procedures, he did not exercise control over these actions, and therefore, cannot be sanctioned for them. He also argues that HUD failed to identify any specific actions which Kisser could have taken in his capacity as vice president to remedy DRG's misconduct, which he claims is required by *Novicki v. Cook*, 946 F.2d 938 (D.C.Cir.1991), in which we reversed the debarment of a company officer based on his company's misconduct.

In so arguing, Kisser misstates both the test for the debarment under HUD's regulations, and its application in *Novicki*. HUD need not show that Kisser was the final decisionmaker in DRG's pass through actions to sustain his debarment. Rather, HUD was justified in debarring Kisser if the record shows that, in his capacity as executive vice president of DRG, he "participated in, knew of, or had reason to know" of DRG's misconduct. 24 C.F.R. § 24.325(b)(2). This the record amply shows.

Kisser's position at DRG was distinctive. He was brought into the company as an expert in underwriting and servicing multifamily projects, and, before even beginning work at DRG, he studied all of the relevant documents and the MBS Guide in order to familiarize himself with the GNMA MBS co-insurance program. As executive vice president for administration, he was charged with general oversight of GNMA pool administration, second in command only to DRG's president, Donald DeFranceaux. In this capacity, he was responsible for handling the disposition of delinquent mortgages in DRG's portfolio, many of which were funded through GNMA mortgage-backed securities.

The primary misconduct for which DRG was cited involved DRG's decision to defy GNMA after the agency had clearly instructed that the proper treatment of foreclosure sale proceeds was to pass them through for the corresponding pool in the month following receipt. Kisser participated in the July meeting at which GNMA put forth its position regarding the proper treatment of pass-throughs, and later stated that GNMA's position regarding pass-throughs had been "clearly articulated" at that time. In September, he participated in discussions with DeFranceaux and DRG counsel regarding DRG's decision to defy HUD's directive regarding the pass through of foreclosure proceeds. Later that month, he also participat-

---

6. Kisser does not challenge on appeal whether DRG's actions were misconduct, subject to sanction under HUD regulations, but only whether he is appropriately held responsible for this misconduct. Without dwelling on this issue, we do note the following. The record does reflect that, beginning in July 1988, the question of how to handle foreclosure sale proceeds was contested with some force by DRG. On September 15, 1988, however, HUD's general counsel, writing on behalf of HUD's under secretary, affirmed the agency's position that the GNMA program requirements mandated that DRG pass through foreclosure sale proceeds to security holders in the month following their receipt.

Once the under secretary had set forth his interpretation of GNMA's program requirements, DRG's argument that they were ambiguous lost force. *See Udall v. Tallman*, 380 U.S. 1, 16–17, 85 S.Ct. 792, 801–802, 13 L.Ed.2d 616 (1965) (Secretary's interpretation of agency's own regulations entitled to great deference); *Railway Labor Executives' Ass'n v. United States*, 987 F.2d 806, 818 (D.C.Cir.1993) (agency's interpretation of own decrees or regulations entitled to considerable deference).

ed in discussions regarding DRG's decision to use $1.8 million of September foreclosure sale proceeds to repay the company for advances of principal and interest made to security holders from its corporate account, an action taken in plain defiance of HUD's instructions.

The fact that Kisser was a participant, and not the ultimate decisionmaker, in these meetings, and that the September decisions were made on the advice of counsel, does not insulate him from sanction. *See* 24 C.F.R. § 24.325(b)(2).

*Novicki v. Cook,* 946 F.2d 938 (D.C.Cir. 1991), supports our conclusion that HUD was justified in taking debarment action against Kisser. Contrary to Kisser's contentions, *Novicki* does not require that HUD point to specific actions which he could have taken to alter the DRG decisions at issue. Rather, in that case, applying a similar test to that used by HUD in this case, we overturned the debarment of a company president because the record evidence did not support the conclusion that the debarred officer had "reason to know" of the company's misconduct. *Compare* 48 C.F.R. § 9.406–5(b) (allowing debarment of an officer if he or she "participated in, knew of, or had reason to know of the contractor's [mis]conduct") *with* 24 C.F.R. § 24.325(b)(2) (allowing debarment of an officer if he or she "participated in, knew of, or had reason to know of [a] participant's [mis]conduct"). Here, by contrast, there is substantial evidence in the record to establish that Kisser not only had "reason to know" of DRG's misconduct, but participated in it as well.

We therefore conclude that the district court erred in relying on *Caiola* to reverse the agency's decision to debar Kisser. Its decision must be reversed, and the agency's ruling reinstated.