**FRATERNAL ORDER OF POLICE, D.C., et al., Plaintiffs,**

v.

**Robert E. RUBIN, et al., Defendants.**

No. Civ.A.96–1434(HHK).

United States District Court, District of Columbia.

Oct. 30, 1998.

---

Eric S. Lipsetts, WIlliam George Jepson, Jr., Simmons & Lipsetts, Annapolis, MD, Stephen G. De Nigris, Washington, DC, for Plaintiffs.

Jerri Ulrica Dunston, U.S. Attorney's Office, Washington, DC, for Defendants.

## MEMORANDUM OPINION AND ORDER

KENNEDY, District Judge.

This case involves an investigation by the United States Secret Service Uniformed Division into the release of a videotape recording of a meeting at which the division's policy regarding the enforcement of District of Columbia laws was announced. The plaintiffs allege that the policy is illegal and that the defendants violated their First and Fifth Amendment rights during the investigation. The plaintiffs seek declaratory and injunctive relief as well as monetary damages.

Presently before the court is the defendants' motion to dismiss. After consideration of the motion, the responses thereto, and the entire record of the case, the court concludes that the motion as to the policy claim (Count 1) and the Fifth Amendment claim (Count 4) should be granted and that the motion as to the First Amendment claims (Counts 2, 3, and 5) should be granted in part and denied in part.

### I. Background

The Uniformed Division of the United States Secret Service (the "Uniformed Divi-

sion") is a permanent police force under the supervision of the Secretary of the Treasury and the management of the Director of the United States Secret Service. 3 U.S.C.A. § 202 (West 1998). As the successor to the White House Police and the Executive Protective Service, the Uniformed Division since 1977 has performed such duties as protecting the White House, the Treasury Building, and foreign diplomatic missions. *See id.*

At an informal meeting on April 24, 1996, Deputy Chief Steve Johnson of the United States Secret Service Uniformed Division announced a policy that Uniformed Division officers would no longer enforce minor traffic laws and would no longer request a "rolling tag check," and should refer persons in non-life-threatening situations to the D.C. Metropolitan Police. Complaint ¶ 22–24; Def.'s Motion to Dismiss at 2–3. Johnson then allegedly threatened officers with transfer or disciplinary action[1] for non-compliance with this policy ("Johnson policy").[2] Complaint ¶ 25.

Certain officers secretly videotaped the April 24 meeting. The Fraternal Order of Police, D.C. Lodge 1, USSS/UD Labor Committee came into possession of the videotape and released portions of it to the news media. Defendants Eljay Bowron and Richard Friedman subsequently ordered an internal investigation to determine who was responsible for videotaping the meeting and who had made the decision to release the videotape. Pursuant to the investigation, Defendants Dana A. Brown and Michael Prendergast questioned officers, including the plaintiffs, at length. Brown and Prendergast allegedly threatened the officers with disciplinary action if they failed to disclose confidential conversations between the Fraternal Order of Police and its counsel, or if they disclosed the questions asked or the statements given.

The plaintiffs have brought this action against the four defendants named above and Secretary of the Treasury Robert Rubin, each of them individually and also in his respective official capacity. The complaint requests a declaratory judgment stating in effect that the Johnson policy violates 3 U.S.C. § 202, the statute creating the Uniformed Division. The complaint also includes various counts alleging violations of the plaintiffs' First and Fifth Amendment rights and seeking declaratory and injunctive relief, monetary damages, and the exclusion of evidence obtained during the investigation.

## II. STANDARD OF REVIEW

This matter is before the court on a motion to dismiss. Accordingly, the court must take the allegations in the plaintiffs' pleading as true and must construe them in a light most favorable to the plaintiffs. *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957); *Sinclair v. Kleindienst,* 711 F.2d 291, 293 (D.C.Cir.1983). Dismissal is appropriate only when it appears beyond doubt that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *Conley* 355 U.S. at 45–46, 78 S.Ct. 99.

## III. DISCUSSION

### A. The Policy Claim

Count I of the Labor Committee's complaint asks the court to imply a cause of action under 3 U.S.C. § 202 whereby Uniformed Division officers would have "a legal right and obligation to enforce all the laws that they are authorized to enforce." Complaint ¶ 82(B)(1), at 14. The recognition of this "legal right" would then serve as the logical predicate for the officers' "legal right not to be threatened with transfer and/or disciplinary action by its managers for enforcing laws which they are sworn to uphold," their "right not to be exposed by the [Uniformed Division] to an unreasonable and increased risk of injury or death because of its illegal policy," and their right to enjoin the defendants from taking disciplinary action against any Uniformed Division officer "solely because the police officer enforces the

---

1. The plaintiffs assert that USSS/UD management "uses transfer extensively as a disciplinary measure." Compl. ¶ 26.

2. In a later filing, the plaintiffs specifically state that one officer was "docked overtime pay and sent home because he initiated a 'rolling tag check'." (Pls.' Resp. at 7.) Also, "officers were called into a supervisor's office or met on the street to account for themselves and state the reasons for why they initiated an arrest." *Id.*

**139**

laws of the District of Columbia." *Id.* at ¶ 82(B)(2)–(4).

■ Reading the complaint literally, the Labor Committee is asking for the judicial recognition of a tautology (that the officers may do what they have the right to do) and the judicial imposition of a duty of omniscience on the officers they represent (that they must enforce every law within their jurisdiction at all times). Under the construction most favorable to the Labor Committee, however, Count I of the complaint essentially seeks a declaration that the statute gives Uniformed Division officers the right to enjoin their managers from limiting the scope of their law enforcement activities. Even under this reading, however, the Labor Committee lacks standing to pursue its claim.

■ For a plaintiff to have standing, the complaint must fall within "the zone of interests to be protected or regulated by the statute or constitutional guarantee in question." *National Credit Union Admin. v. First National Bank & Trust Co.,* 522 U.S. 479, ——, 118 S.Ct. 927, 933, 140 L.Ed.2d 1 (1998) (quoting *Association of Data Processing Service Orgs. v. Camp,* 397 U.S. 150, 153, 90 S.Ct. 827, 25 L.Ed.2d 184 (1970)). The Labor Committee contends that their claim is supported by the last sentence of § 202: "The members of [the Uniformed Division] shall possess privileges and powers similar to those of the members of the Metropolitan Police of the District of Columbia." The Labor Committee interprets this language as requiring that Uniformed Division officers be assigned the same range of duties as Metro-politan Police officers. *See* Pl. Resp. Opp'n Def.'s Mot. Dismiss at 14 n. 19 ("The Congress has already made the determination that Uniformed Division officers possess the same privileges and powers similar [sic] to the Metropolitan Police. There is no discretion for the Agency to exercise."); *id.* at 15 ("Simply stated, the statute leaves nothing committed to the Agency's discretion."). This appeal to textualism is the Labor Committee's sole argument in support of their policy claim. It is without merit.

The flaw in the committee's reasoning is that "sameness" is a symmetric relationship. Were the court to adopt the committee's conflation of the terms "similar" and "the same," the unintended result would be that the officers of the Uniformed Division and the Metropolitan Police would be left with *the same* privileges and powers. The court declines the invitation to find that the Uniformed Division and the Metropolitan Police had the same law enforcement authority not only in the District of Columbia at large, but also in the White House, in the Treasury Building, and in foreign diplomatic missions.

The Labor Committee's claim remains meritless even if removed from this unfortunate line of reasoning. Far from having "determined the Uniformed Division's authority" to undertake law enforcement activities in the District of Columbia, Pl. Resp. Opp'n Def.'s Mot. Dismiss at 14, Congress has specifically provided that such activities may be the subject of cooperative agreements between the Uniformed Division and the Metropolitan Police. *See* D.C.Code § 4—192 (1998).[3] For example, the two

---

3. In relevant part, the statute provides:

§ 4–192 Cooperative Agreements Between Federal Agencies and Metropolitan Police Department.

(a) Agreements.—Each covered federal law enforcement agency may enter into a cooperative agreement with the Metropolitan Police Department of the District of Columbia to assist the Department in carrying out crime prevention and law enforcement activities in the District of Columbia....

(b) Contents of Agreement.—An agreement entered into between a covered federal law enforcement agency and the Metropolitan Police Department pursuant to this section may include agreements relating to:

(1) Sending personnel of the agency on patrol in areas of the District of Columbia which immediately surround the area of the agency's jurisdiction, and granting personnel of the agency the power to arrest in such areas; ...

(4) Permitting personnel of the agency to carry out processing and papering of suspects they arrest in the District of Columbia; and

(5) Such other items as the agency and the Metropolitan Police Department may agree to include in the agreement....

(d) Covered Federal Law Enforcement Agencies Described.—In this section, the term "covered federal law enforcement agency" means any of the following: ....

(21) Uniformed Division, United States Secret Service.

(22) United States Secret Service.

D.C.Code § 4–192 (1998). Congress enacted this statute on August 5, 1997. *See* National Capital

agencies may coordinate their law enforcement activities by defining the areas of the District of Columbia where Uniformed Division officers have the power to arrest and the authority to paper and process suspects. *See id.* It would be beyond the court's sound discretion to declare that individual officers of the Uniformed Division have the right to final review over such a Congressionally-authorized management effort. *See Hanes Corp. v. Millard,* 531 F.2d 585, 591 (D.C.Cir.1976) (noting that a district court's exercise of its discretion to grant or deny declaratory relief must be "sound" and is subject to "quite searching" appellate review).

■ Although the Labor Committee has not stated a claim under the Administrative Procedure Act, 5 U.S.C. § 701–06 (1970), the court will also examine this possible alternative source of statutory standing. The Administrative Procedure Act grants standing to challenge a "final agency action for which there is no other adequate remedy in a court," *id.* at § 704, to any "person suffering legal wrong ... or adversely affected or aggrieved" by it,[4] *id.* at § 702. *See Heckler v. Chaney,* 470 U.S. 821, 828, 105 S.Ct. 1649, 84 L.Ed.2d 714 (1985). There are, however, certain exceptions. Specifically, § 701(a) provides that the statute's provision for judicial review "applies except to the extent that—(1) statutes preclude judicial review; or (2) agency action is committed to agency discretion by law." *See id.* ("[B]efore any review at all may be had, a party must first clear the hurdle of § 701(a).").

■■ The "committed to agency discretion by law" exception is "very narrow." *Cit-*

*izens to Preserve Overton Park v. Volpe,* 401 U.S. 402, 410, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971). Despite this, an agency's decision not to take enforcement action is presumed to lie within this exception. *Heckler,* 470 U.S. at 832, 105 S.Ct. 1649. A party may rebut the presumption of non-reviewability "where the substantive statute has provided guidelines for the agency to follow in exercising its enforcement powers." *Id.* at 833, 105 S.Ct. 1649.

■ In this case, the decision as to the scope of the Uniformed Division's law enforcement activities is presumed to be committed to the defendants' discretion. The relevant statute cannot serve to rebut this presumption. Congress provided no guidelines in 3 U.S.C. § 202 that inform how the defendants should exercise the Uniformed Division's authority to enforce D.C. laws. *Cf. Kisser v. Cisneros,* 14 F.3d 615, 622 (1994) (finding agency decision non-reviewable where "no statute expressly provides for debarment actions or contains guidelines that inform HUD's decision to bring such actions") with *Adams v. Richardson,* 480 F.2d 1159, 1162 (finding agency decision reviewable where the statute "not only requires the agency to enforce the Act, but also sets forth specific enforcement procedures."). The Labor Committee therefore lacks standing to seek judicial review of the Johnson Policy under the Administrative Procedure Act.

In sum, the Labor Committee has failed to persuade the court that the last sentence of 3 U.S.C. § 202 provides a cause of action for individual officers of the Uniformed Division to challenge their superiors' decisions about

---

Revitalization and Self–Government Improvement Act of 1997, Pub.L. No. 105–33, § 11712(a)–(d), 111 Stat. 782 (1997).

**4.** To meet this threshold requirement, a plaintiff must demonstrate that the injury is perceptible, concrete, specific, *see id.* at 689, and real and immediate rather than conjectural or hypothetical, *California Bankers Association v. Shultz,* 416 U.S. 21, 69, 94 S.Ct. 1494, 39 L.Ed.2d 812 (1974). An association may seek relief not only for any institutional injuries which it might have suffered, but also as a representative of its members if those members would have standing if they themselves brought suit. *Warth v. Seldin,* 422 U.S. 490, 511, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975).

In this case, the plaintiffs allege that "[o]ne officer was docked overtime pay and sent home because he initiated a 'rolling tag check.'" Pl. Resp. at 7 n. 13. The officer's loss of pay is a perceptible, concrete, specific, real and immediate injury sufficient to confer standing to the Labor Committee as his representative. See *Public Citizen v. Lockheed Aircraft Corp.,* 565 F.2d 708, 714–15 (D.C.Cir.1977). The court need not reach this determination, however, because the Johnson Policy falls within the "committed to agency discretion" exception to the Administrative Procedure Act's judicial review provisions. *See* 5 U.S.C. § 701(a)(2).

how best to allocate the division's limited resources to meet the community's needs. Moreover, such decisions, having been committed by Congress to the agency's discretion, are immune from judicial review under the Administrative Procedure Act. Consequently, it would not be within the court's sound discretion to issue a declaratory judgment on Count I.

## B. The First Amendment Claims

Count II of the complaint alleges that the defendants' investigation "did not advance any legitimate goal" and is designed to discourage and prevent officers from associating with the committee, attending its meetings, and furthering its goals, in violation of the officers' First Amendment rights. Count III alleges that the defendants' investigation had no legitimate goal and inhibits the plaintiffs from candid discussions in the committee's executive board meetings, from candid discussions with their legal counsel, from obtaining "sound legal advice," and from meaningful access to the courts, in violation of the officers' First Amendment rights. Count V alleges that the defendants' investigation inhibits the plaintiffs from conferring with legal counsel and discussing the questioning among themselves, in violation of the officers' First Amendment rights. In each of these counts, the Labor Committee seeks judgment in excess of $250,000, costs, declaratory and injunctive relief, and attorney's fees. In Count III, the committee also requests the exclusion of all evidence obtained as a result of the investigation.

■ Governmental action that falls short of a direct prohibition on speech may nevertheless violate the First Amendment by "chilling"[5] the free exercise of speech. *Laird v. Tatum*, 408 U.S. 1, 11, 92 S.Ct. 2318, 33 L.Ed.2d 154 (1972). As the Supreme Court has recognized, the threat of sanctions may deter the exercise of First Amendment rights almost as potently as the actual application of sanctions. *NAACP v. Button*, 371 U.S. 415, 433, 83 S.Ct. 328, 9 L.Ed.2d 405 (1963). Despite this, plaintiffs challenging

governmental action must establish Article III standing by asserting "a claim of specific present objective harm or a threat of specific future harm." *Laird*, 408 U.S. at 14, 92 S.Ct. 2318.

■ This circuit has noted that a "chilling effect" consisting of "present deterrence from First Amendment conduct because of the difficulty of determining the application of a regulatory provision to that conduct" should be distinguished from the actual or threatened harm that supports standing. *United Presbyterian Church v. Reagan*, 738 F.2d 1375, 1380 (D.C.Cir.1984) (Scalia, J.). *Laird* and other Supreme Court cases citing a "chilling effect" cite it "as the reason why the governmental imposition is invalid rather than as the harm which entitles the plaintiff to challenge it." *Id.* at 1378. Thus, in the governmental regulation and surveillance contexts, the harm of a "chilling effect," without more, does not support standing. *Id.* at 1380. Where, however, the government engages in discretionary actions resulting in threatened injury "for specifically contemplated First Amendment activity," the threatened harm will support standing if it satisfies the Article III injury-in-fact requirement. *Id.*

■ In this case, the Labor Committee has alleged that the defendants threatened the plaintiffs with disciplinary action up to dismissal if they refused to testify or if they spoke among themselves or to counsel. Compl. ¶ 125. There is no governmental regulation or surveillance of broad applicability at issue here, and no ambiguity as to the application of the alleged threat to the plaintiffs' conduct. Assuming that the plaintiffs' allegation is true, the defendants' threat should be reviewed as a discretionary governmental action directed at the plaintiffs for specifically contemplated First Amendment activity.

■ The Article III injury-in-fact requirement places the burden on the plaintiff to show "an invasion of a judicially cognizable interest which is (a) concrete and particular-

---

5. Justice Frankfurter first introduced the term "chilling effect" in the First Amendment context in 1952. See *Wieman v. Updegraff*, 344 U.S. 183, 195, 73 S.Ct. 215, 97 L.Ed. 216 (1952) (Frankfurter, J., concurring).

ized and (b) actual and imminent, not conjectural or hypothetical." *United States v. Hays,* 515 U.S. 737, 742, 115 S.Ct. 2431, 132 L.Ed.2d 635 (1995) (quoting *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 560–561, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992)). The alleged threat of discipline up to dismissal directed at the plaintiffs is a concrete, particularized and imminent harm sufficient to satisfy this requirement. See *Levin v. Harleston,* 966 F.2d 85, 89 (2nd Cir.1992) (holding that district court did not err in finding that an implicit threat of discipline was sufficient to create a judicially cognizable chilling effect on employee's First Amendment rights); *Trotman v. Board of Trustees of Lincoln University,* 635 F.2d 216, 228 (3rd Cir.1980) (finding threats of discipline up to dismissal constituted state action subject to First Amendment scrutiny). Therefore, the Labor Committee has standing under the First Amendment to challenge the threats allegedly made by the defendants in connection with the investigation, provided that the threats were directed at "judicially cognizable interests."

### 1. The Release of the Videotape

To determine whether the Labor Committee's First Amendment claims constitute "judicially cognizable interests," it is necessary first to consider whether the release of the videotape was lawful, inasmuch as this question bears on the legitimacy of the investigation. See *Palestine Information Office v. Shultz,* 853 F.2d 932, 941 (D.C.Cir.1988) (noting that "[t]he Court has long been willing to uphold limitations on free association conducted for an illegitimate purpose.") (citation omitted). Understandably, the Labor Committee has not specifically pleaded the legality of the release of the videotape, thereby volunteering the subject matter of a contested investigation; however, the committee has implied that the release of the videotape was a lawful act. See Pl. Resp. at 21 (claiming First Amendment right of association to further the group's "lawful interest" and noting that the amended complaint describes the Labor Committee as a "lawful organization").

 The Supreme Court has established a two-step approach to evaluating a government employee's challenge to restraints on speech. As a threshold matter, the Court determines whether the speech in question addresses a matter of public concern. Matters of public concern are those of interest to the community, whether for social, political, or other reasons. See *Connick v. Myers,* 461 U.S. 138, 145–49, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983). If the speech addresses a matter of public concern, a court must balance "the interests of the [employee], as a citizen, in commenting upon matters of public concern and the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees." *Pickering v. Board of Education,* 391 U.S. 563, 568, 88 S.Ct. 1731, 20 L.Ed.2d 811 (1968). Thus, once an employee demonstrates a judicially cognizable First Amendment interest in speech that addresses a matter of public concern, the burden is on the government to show that interest is "outweighed by that expression's 'necessary impact on the actual operation' of the Government." *United States v. National Treasury Employees Union,* 513 U.S. 454, 468, 115 S.Ct. 1003, 130 L.Ed.2d 964 (1995) (quoting *Pickering,* 391 U.S. at 571, 88 S.Ct. 1731).

 Applying the *Pickering/Connick* balancing test to the release of the videotape, the court finds that the Labor Committee has alleged a judicially cognizable First Amendment interest in speech that addresses a matter of public concern. Compl. ¶ 96. An official policy that sets forth the time, place and manner in which the Uniformed Division is to serve the D.C. public is of interest to the D.C. community and is both literally and logically a matter of legitimate public concern. This finding is supported by the plaintiffs' allegations that the release of the videotape was widely covered by local media and that it prompted complaints to the Secret Service by members of Congress. Compl. ¶ 102.

 At the same time, the Uniformed Division has not met its burden of demonstrating that the release of the videotape had a " 'necessary impact on the actual operation' of the government." The substance of the Johnson policy was that Uniformed Division

officers would inform the public that persons in non-life-threatening situations should request assistance from the Metropolitan Police. *See* Compl. ¶ 24; Def.'s Mot. Dismiss at 3. To the extent that the release of the videotape to the news media had a "necessary impact," it was to communicate this vital information to the general public far more efficiently and proactively than a series of frustrating encounters between Uniformed Division officers and individuals in immediate need of police assistance. *See* Compl. ¶ 102. Indeed, the defendants have not identified any interest in service efficiency that would be logically attributable to keeping the Johnson policy a secret. The court therefore concludes that the release of the videotape likely was a lawful act protected by the First Amendment.[6]

## 2. Compelled Speech

■ The Supreme Court in various contexts has held that the government may violate the First Amendment by compelling speech. *See, e.g., Riley v. National Fed. of the Blind,* 487 U.S. 781, 108 S.Ct. 2667, 101 L.Ed.2d 669 (1988) (invalidating law requiring citizens to disclose certain facts connected with other protected activities); *Abood v. Detroit Bd. of Educ.,* 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (1977) (invalidating law that required citizens to fund objectionable speech by others). For example, the Supreme Court has upheld challenges to state requirements that advocacy groups disclose membership lists, because such disclosure may deter citizens from associating with a controversial group. *See e.g., Brown v. So-*

*cialist Workers '74 Campaign Comm.,* 459 U.S. 87, 103 S.Ct. 416, 74 L.Ed.2d 250 (1982); *Gibson v. Florida Legislative Investigation Comm.,* 372 U.S. 539, 83 S.Ct. 889, 9 L.Ed.2d 929 (1963); *Bates v. Little Rock,* 361 U.S. 516, 80 S.Ct. 412, 4 L.Ed.2d 480 (1960); *NAACP v. Alabama,* 357 U.S. 449, 78 S.Ct. 1163, 2 L.Ed.2d 1488 (1958). Although these cases did not invalidate the laws under challenge, they did recognize a right to an exemption on the part of someone who could show a " 'reasonable probability' that the compelled disclosure would result in 'threats, harassment, or reprisals from either Government officials or private parties.' " *McIntyre v. Ohio Elections Comm.,* 514 U.S. 334, 379, 115 S.Ct. 1511, 131 L.Ed.2d 426 (Scalia, J., dissenting) (quoting *Buckley v. Valeo,* 424 U.S. 1, 74, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam)).

■ The Labor Committee has alleged that the plaintiffs were compelled to disclose not only whether they were a member of the Executive Board, Compl. ¶ 168, but also the substantive content of discussions and motions at specific Executive Board meetings. Compl. ¶ 109. The Labor Committee has further alleged that the defendants have threatened the plaintiffs with disciplinary action and removal[7] if they failed to disclose who sponsored and voted for the motions concerning the release of the videotape. Compl. ¶ 109–10. Assuming that these allegations are true, it may be inferred that there is a reasonable probability that the compelled disclosure would result in threats, harassment, or reprisals from the defendants

---

**6.** The defendants' conclusory characterization of the videotape as a "clear violation" of internal agency rules does not disturb this finding. *See* Def. Mot. Dismiss at 3; see Compl. ¶ 151 ("The practical effect of this investigation was … to support and prove a pre-determination by Defendants Bowron and Friedman that a violation of agency rules and regulations had in fact occurred."). Specifically, Subpart B, Section 0.206 of the Department of Treasury Employee Rules of Conduct provides: "Employees shall not disclose official information without proper authority, pursuant to Department or bureau regulation." *Id.* at 3 n. 4. Under the defendants' version of the facts, however, the policy announced at the internal meeting was "the standing policy" of the Uniformed Division, *id.* at 2, and therefore contained no new information to

be disclosed. Thus, it is doubtful that the release of the videotape was a violation of agency rules.

Although the plaintiffs have not raised an invasion of privacy counterclaim, it is also worth noting here that when the subject matter of publicity is of legitimate public concern, there is no invasion of privacy. *See* Restatement of Torts (Second) § 652D, comment d.

**7.** The Labor Committee also alleges that the defendants threatened the officers' families during the interrogations. The substance of these threats appears to be that "officers were routinely reminded that before answering questions, they should remember that they have families to support." This statement is viewed as no more and no less than a threat of removal.

against those who voted to release the tape. On motion to dismiss, these alleged injuries are sufficient for a finding that the plaintiffs have alleged a judicially cognizable First Amendment interest in not being compelled to disclose the substance of the meetings of its Executive Board.

### 3. Forbidden Speech

 The Labor Committee has alleged that the defendants have threatened the plaintiffs with discipline up to dismissal if they disclose the substance of their statements "with any other officer or with officers interrogated." This is a content-based restriction on speech, and is therefore subject to "the most exacting" First Amendment scrutiny. *See Boos v. Barry,* 485 U.S. 312, 321, 108 S.Ct. 1157, 99 L.Ed.2d 333 (1988). Thus, on motion to dismiss, the court concludes that the plaintiffs have alleged a judicially cognizable First Amendment interest in the forbidden speech sufficient to support standing. *See Connick,* 461 U.S. at 142, 103 S.Ct. 1684, 75 L.Ed.2d 708 (1983) (holding that a government employer "cannot condition public employment on a basis that infringes the employee's constitutionally protected interest in freedom of expression.").

### 4. Relief

 On defendants' motion to dismiss, for the reasons stated above, the court credits the Labor Committee's allegations of threats as judicially cognizable injuries-in-fact. Therefore, the motion to dismiss will be denied as to the Labor Committee's claims for declaratory and injunctive relief. With respect to monetary damages, however, the complaint has failed to state a claim upon which relief can be granted. Specifically, the committee has not alleged that any of the plaintiffs have been subject to sanctions as a result of First Amendment activity. *See Jones v. Unknown Agents of the Fed. Election Comm'n,* 613 F.2d 864, 876 n. 24 (D.C.Cir.1979) (dismissing claim for money damages under the First Amendment where no sanctions were taken against plaintiffs for refusal to answer compelled questions).

### C. The Fifth Amendment Claims

In Count IV of their complaint, the officers allege that their Fifth Amendment rights were violated. Specifically, the officers allege that they requested and were refused to have counsel present during these interrogations, that they were unlawfully intimidated and coerced, and that the questions were not narrowly tailored to their job performance.

 The Due Process Clause of the Fifth Amendment imposes constraints on governmental decisions that deprive individuals of "liberty" or "property" interests. *Mathews v. Eldridge,* 424 U.S. 319, 332, 96 S.Ct. 893, 47 L.Ed.2d 18 (1976). Thus, in analyzing a claim of due process rights under the Fifth Amendment, "the first step is to identify a property or liberty interest entitled to due process protections." *Brock v. Roadway Express, Inc.,* 481 U.S. 252, 260, 107 S.Ct. 1740, 95 L.Ed.2d 239 (1987) (citing *Cleveland Board of Education v. Loudermill,* 470 U.S. 532, 538–539, 105 S.Ct. 1487, 84 L.Ed.2d 494 (1985); *Board of Regents v. Roth,* 408 U.S. 564, 576–578, 92 S.Ct. 2701, 33 L.Ed.2d 548 (1972)).

 The legitimate expectation of continued employment, a property interest, is the only potential interest implicated here. For example, a local government employee who serves at the pleasure of his employer has no legitimate expectation of continued employment and thus no property interest. *See Bishop v. Wood,* 426 U.S. 341, 345, 96 S.Ct. 2074, 48 L.Ed.2d 684 (1976), *overruled in part on other grounds, Cleveland Bd. of Educ.,* 470 U.S. at 540–41. Neither party has directly addressed the question of whether the Uniformed Division officers served solely at their employer's discretion. It is not necessary to decide this question, however, because the investigation was not of a nature that gives rise to Fifth Amendment due process rights.

 The requirements of Fifth Amendment due process vary with the type of proceeding involved. *Hannah v. Slawson,* 363 U.S. 420, 440, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960) (citations omitted). In *Hannah,* the Court considered the procedure adopted by the Federal Commission on Civil Rights

whereby the Commission prevented disclosure of the complainants' identities and did not permit the subjects of the investigation to cross-examine witnesses. *See id.* at 421–22, 80 S.Ct. 1502. Reviewing the enabling statute, the Court found that the Commission's function

> is purely investigative and fact-finding. It does not adjudicate. It does not hold trials or determine anyone's civil or criminal liability. It does not issue orders. Nor does it indict, punish, or impose any legal sanctions. It does not make determinations depriving anyone of his life, liberty, or property.

*Id.* at 441, 80 S.Ct. 1502. The Court distinguished fact-finding hearings, in which "it is not necessary that the full panoply of judicial procedures be used," from adjudicatory hearings in which an administrative agency makes binding determinations that directly affect protected interests. *Id.* at 442, 80 S.Ct. 1502. In adjudicatory hearings, "it is imperative that those agencies use the procedures which have traditionally been associated with the judicial process." *Id.* at 442, 80 S.Ct. 1502.

The Labor Committee fails to allege that the interrogations constituted adjudicatory proceedings rather than fact-finding hearings. The committee does allege that the "the practical effect of this investigation ... was to support and prove a pre-determination" that the release of the videotape had violated agency rules, Compl. ¶ 151, and that the defendants "had the authority to immediately relieve the Plaintiffs from duty." Pl. Resp. at 28. The committee also suggests that "[t]he tenor of the investigation clearly reflected that there was a distinct possibility that a criminal investigation was in progress." Pl. Resp. at 28–29; Compl. ¶ 167.

 The proper inquiry, however, is not whether the agency possessed adjudicatory powers, but whether it actually used those powers in conducting an adjudicatory hearing. *See Hannah v. Larche*, 363 U.S. 420, 442, 80 S.Ct. 1502, 4 L.Ed.2d 1307 (1960) ("when governmental action does not partake of an adjudication, as for example, when a general fact-finding investigation is being conducted, it is not necessary that the full panoply of judicial procedures be used"); *see also Geerator Corp. v. EEOC*, 592 F.2d 765, 768 (4th Cir.1979) ("when only investigative powers of an agency are utilized, due process considerations do not attach"). Due process is satisfied "if there is an opportunity to be heard before any final order of the agency becomes effective." *Id.* at 769 (citing *Ewing v. Mytinger & Casselberry, Inc.*, 339 U.S. 594, 598, 70 S.Ct. 870, 94 L.Ed. 1088 (1950)); see also *Haines v. Askew*, 368 F.Supp. 369 (M.D.Fla.1973), *aff'd mem.*, 417 U.S. 901, 94 S.Ct. 2596, 41 L.Ed.2d 208 (1974) (upholding a hearing procedure that denied a teacher active counsel where findings could not, without a separate hearing, result in punitive action).

Focusing on the investigation that actually occurred rather than the Labor Committee's premonitions in the shadow of the defendants' "vast authority," it does not appear that the determinations to be reached during the actual investigation were to be binding on any party or were to directly affect any protected interests. Moreover, the committee's fear of a criminal investigation, apparently based on speculation about activities in the U.S. Attorney's Office, does not bear on the actual investigation wherein the defendants specifically informed the officers that a criminal investigation was *not* in progress. *See* Compl. ¶ 166.

In the absence of any allegation that the defendants took any effective action against the officers in connection with, or as a result of, the investigation, the court must conclude that the interrogations were "purely investigative and fact finding," not adjudicatory, and did not give rise to a Fifth Amendment right to counsel, freedom from intimidation, or narrowly tailored questioning.

### D. Qualified Immunity

 The Supreme Court has held that a cause of action may exist against federal officials individually for violations of a person's constitutional rights while acting in an official capacity. See *Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Despite this, however,

government officials performing discretionary functions are entitled to qualified immunity, and are thereby shielded from liability for civil damages, insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Harlow v. Fitzgerald,* 457 U.S. 800, 817, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Whether constitutional rights are "clearly established" is a question of "objective legal reasonableness," rather than good faith. *Id.* at 819, 102 S.Ct. 2727. Since this determination often turns on the level of generality at which the inquiry is made, a court should review the official conduct at a particularized level: "The contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 639–40, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987).

 The only alleged violations of the officers' constitutional rights that can survive the motion to dismiss are the First Amendment claims relating to the compelled disclosure of the substance of Executive Board meetings and the prohibition against discussing the investigation with other officers.

It is clear from the record that the defendants questioned the officers and forbade discussion of the investigation in the belief that a violation of agency rules had occurred. *See* Compl. ¶ 115; Def. Mot. Dismiss at 3. Under the circumstances in this case, where the plaintiffs themselves have relied heavily upon a dubious statutory construction, the court finds that the defendants' reliance on their own reading of agency rules was objectively reasonable.

Given the defendants' assumption that a job-related violation of agency rules had occurred, it would have been objectively reasonable for an investigator to conclude that he could, consistent with an employee's First Amendment rights, compel that employee to answer questions relating to that violation upon pain of dismissal. *See Gardner v. Broderick,* 392 U.S. 273, 278, 88 S.Ct. 1913, 20 L.Ed.2d 1082 (1968) (indicating that the state may compel job-related testimony from an police officer, provided that the state does not make direct or derivative use of the officer's statement against the officer in any criminal proceeding); *Wiley v. Mayor and City Council of Baltimore,* 48 F.3d 773, 777 (4th Cir.1995) (same). Similarly, it would have been objectively reasonable for an investigator to decide that the First Amendment permitted him to limit the communication among the parties to an ongoing internal investigation "in order to insure the most accurate and efficient investigation possible." *Black v. City of Auburn, Alabama,* 857 F.Supp. 1540, 1550 (M.D.Ala.1994); *see also Los Angeles Police Protective League v. Gates,* 579 F.Supp. 36, 39–41 (C.D.Cal.1984) (applying the *Pickering* balancing test, 391 U.S. at 568, 88 S.Ct. 1731, to uphold an order preventing a police officer from discussing an internal investigation with other suspects or witnesses in the division).

 The court concludes that the officials did not violate any clearly established statutory or constitutional rights of which a reasonable person would have known. Accordingly, the defendants are entitled to qualified immunity, and all claims against the defendants in their individual capacities must be dismissed.[8]

## IV. CONCLUSION

For the foregoing reasons, it is this 30th day of October, 1998, hereby

**ORDERED** that the defendants' motion to dismiss is **GRANTED** as to Counts 1 and 4; and it is further

**ORDERED** that the defendants' motion to dismiss is **GRANTED** as to Counts 2, 3, and

---

8. Indeed, plaintiffs have not even alleged personal involvement of defendant Rubin. Thus, he can have no individual liability.

Moreover, with respect to defendants Bowron and Friedman, the Labor Committee concedes that their involvement extends only so far as their roles as supervisors within the Secret Service. Compl. ¶ 36. Insofar as the Labor Committee may be seeking by this to impose liability solely on a respondeat superior basis, such a theory has been rejected in this circuit for the imposition of *Bivens* liability. *See Boykin v. District of Columbia,* 689 F.2d 1092, 1097–99 (D.C.Cir.1982); *Tarpley v. Greene,* 684 F.2d 1, 9–11 (D.C.Cir.1982).

5 with respect to the plaintiffs' claims for monetary relief; and it is further

**ORDERED** that defendants motion to dismiss is **DENIED** as to Counts 2, 3, and 5 with respect to the claims for declaratory and injunctive relief; and it is further

**ORDERED** that defendants' motion to dismiss is **GRANTED** as to all claims against the defendants in their individual capacities; and it is further

**ORDERED** that in view of the court's findings in Part II.B.1 of this opinion, the claims for the exclusion of evidence are **DISMISSED** as they are moot.